Harry E. GREGOIRE, B. Elaine Gregoire, Homer Enterprises, Inc., Appellants,

v.

NATIONAL BANK OF ALASKA, and A. R. Cronin, Appellees.

No. 609.

Supreme Court of Alaska.

April 7, 1966.

---

22. Jennings v. State, supra note 19, 404 P.2d at 654.

Edgar Paul Boyko, Anchorage, for appellants.

Murphy L. Clark, Hughes, Thorsness & Lowe, Anchorage, for appellee National Bank of Alaska.

William W. Renfrew, Anchorage, for appellee A. R. Cronin.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

NESBETT, Chief Justice.

Appellants' main point on appeal is that the trial court grossly abused its discretion in denying a trial continuance of this case when their counsel was engaged in a criminal trial in a California court and could not be present.

Appellees emphasize the numerous previous delays and continuances in the case, all at appellants' request, to show that denial of an additional continuance was not an abuse of discretion.

The refusal to grant the continuance in question occurred in September of 1964, however, in order to consider the court's order in perspective it is necessary to review many of the proceedings had in the case since it was commenced on May 1, 1962.

The complaint filed by the appellee National Bank of Alaska, hereinafter referred to as the Bank, requested personal money judgments against appellants on cer-

tain notes and guarantees and foreclosure of certain mortgages. Appellants filed a general denial and counterclaimed alleging that the Bank and its predecessor, the Bank of Homer, had conspired with its officers and that the conspiracy resulted in the conversion of $27,000 of appellants' funds to their damage in the sum of $75,000.

On December 29, 1962 appellants filed a third party complaint against A. R. Cronin, alleging that as an officer of the Bank of Homer he had been negligent, had mismanaged funds belonging to appellants and had issued notes on their behalf which they had not signed, to their damage in the sum of $104,000.

A pre-trial order was entered on June 24, 1963 and the case was eventually scheduled to be tried on October 7, 1963. On September 25, 1963 the Bank's notice of the taking of the deposition of a witness in California was vigorously opposed by appellants' counsel on the ground that pre-trial had been completed, discovery had been closed and trial was imminent. The notice of taking was vacated by the court.

The case was then removed from the trial calendar for an October 7th trial because negotiations among the parties indicated that an amicable settlement might be reached. On November 15, 1963 the case was again set for trial by jury on November 25, 1963.

Until November 21, 1963 appellants had been represented by John Stern, Esq. On November 19, 1963 Mr. Stern moved the court to be permitted to withdraw as appellants' attorney, alleging that he had been relieved as attorney by appellants on October 15, 1963; that appellants had picked up and signed a receipt for their files; that on October 15th, he, Stern, had prepared a motion and order for substitution of attorneys for the use of the attorney who was to be substituted, but that the order had never been filed by Stanley J. McCutcheon, the attorney who was to be substituted; that he, Stern, had no further interest in the case, did

not have custody of the files and should be relieved of any further responsibility.

The Bank filed written objection to the motion to withdraw pointing out that the case was scheduled to go to trial in a matter of five days; that there was no showing that counsel and his client were at hopeless odds and that other counsel was not ready to be substituted. At the hearing on the motion appellant Harry E. Gregoire stated to the court that he had asked Mr. Stern to withdraw because of a conflict of interest, but that he had gone to Mr. McCutcheon on October 4 before releasing Mr. Stern; that he had been "perfectly willing to have this thing settled out of Court if possible * * *", that Mr. McCutcheon had referred him to Mr. Merbs, who was not going to represent him. Mr. Merbs was present in court and verified that he would not be representing the appellants. Mr. Stern, in response to a question asked by the court, stated that there was an irreconcilable conflict between his interests and appellants' interests. The court then granted the request to withdraw, but stated that the case would be left on the calendar to be tried the following Monday, November 25, 1963.

On November 21, 1963 appellants had filed a motion for continuance of the trial through Peter Walton, Esq., who advised the court that he was appearing in court only for the purpose of arguing appellants' motion for continuance. The court continued until December 4, 1963 trial of the mortgage foreclosure aspects of the case which were to be severed from the remaining issues. The remaining issues were ordered to be tried by a jury at a later date.

On December 3, 1963 Mr. Walton obtained a stay of proceedings in the case in order to petition the Supreme Court of Alaska for review of the trial court's order denying his motion for continuance. The Bank, by the affidavit of its senior vice-president, Karl V. Holmberg, protested the amount of the bond required for the

stay, alleging that the Bank had brought three witnesses from Homer, Alaska, for the trial at a cost of over $300.00; that it had been prepared for trial on four other occasions at an estimated additional cost of $500.00; that during settlement negotiations in early October "plaintiff", (referring to appellant Harry E. Gregoire) had admitted that his chief desire was to obtain an extension of time within which to pay his obligation which was greater than the period of redemption and that affiant of his own knowledge and belief was convinced that appellants' tactics were delaying and stalling rather than to face a determination on the merits. The amount of the bond remained at $750, which the court specified was to be used to cover appellees' costs on review and all expenses incurred in anticipation of trial.

This court on January 10, 1964 denied appellants' petition to review the trial court's order of December 2, 1963 denying the request for continuance.

On January 16, 1964 the Bank moved that the case be set for trial at the earliest possible date. This motion was noticed for hearing on January 23, 1964. On January 23, 1964 Edgar Paul Boyko, Esq. filed his appearance as counsel for appellant and argued to the court in opposition to the Bank's motion for an early trial. The court granted Mr. Boyko a period of ten days within which to make a showing to substantiate his request that the entire case be reopened for the amendment of appellants' pleadings, to make additional discovery and to hold another pretrial conference.

On January 24, 1964 the Bank filed a motion to disqualify Mr. Walton from taking any further part in the litigation because of a conflict of interest. It was alleged that in February of 1960 Mr. Walton had represented the Bank in setting up the transaction which formed the basis of the Bank's first claim for relief and was then attempting to represent appellants who denied the enforceability of the note and mortgage. Hearing on the motion to disqualify was set for January 29, 1964. On January 28, 1964 Mr. Boyko and Mr. Walton filed a joint entry of appearance on behalf of the appellants and Homer Enterprises, Inc. On the same date Mr. Walton filed a 12 page affidavit denying a conflict of interest. On January 30, 1964 the court held a lengthy hearing on the motion to disqualify and on January 31, 1964 granted the motion. After counsel had disagreed as to the form of the order of disqualification, Mr. Walton filed a written withdrawal, which was accepted by the court.

On February 3, 1964 Mr. Boyko filed a motion for an order reopening discovery and authorizing a new pre-trial conference. On the same date he filed a second amended third party complaint on behalf of appellants setting out four claims; an amended answer and counterclaim setting out eleven separate defenses to the first claim, sixteen separate defenses to the second claim, ten separate defenses to the third claim and a counterclaim again alleging a conspiracy between the Bank and the Bank of Homer to destroy appellants' credit, to wrest valuable property from them, of converting bank funds of appellants and of contriving to impair the ability of counsel to represent appellants. On February 6, 1964 a subpoena duces tecum and notice of taking of deposition issued and on February 7th a demand for jury trial was filed all on appellants' behalf.

Both appellees moved to strike the amended answer and counterclaim and opposed the motion to reopen discovery and grant a new pre-trial conference. The appellee Cronin also moved to strike appellants' second amended third party complaint. After a hearing the court denied appellants' motion to reopen discovery and for a new pre-trial conference, granted appellees' motion to strike the amended answer and counterclaim and granted the motion to set the case for trial. Appellee Cronin's motion to strike the second amended third party complaint was also granted.

Judge Moody reviewed the history of proceedings to that date pointing out that all pleadings had been filed and issue joined, that discovery had been accomplished and pre-trial completed prior to September of 1963 when appellees' motion to take a deposition was vacated by the court on appellants' insistence that the case was ready for trial and the trial date imminent. The judge pointed out that vacation of the various trial settings and the resultant delay was at the instance of appellants on each occasion. After attempting to accommodate counsel the judge finally set the case for trial during the week of March 16, 1964, recognizing the right of counsel to make a showing for a continuance.

On March 2, 1964 Mr. Boyko filed a notice of the special appearance of Kenneth D. Jensen, Esq. for the limited purpose of handling motions and other procedural matters in the absence of trial counsel.

On March 2, 1964 Mr. Boyko filed a motion for continuance of the trial of the case until after April 15, 1964 on the ground that he had a full trial and hearing schedule in March and the first part of April in the courts of Los Angeles. The Bank filed written opposition to the motion, pointing out that attorney Jensen was not shown to be unavailable for the scheduled trial and questioning the validity of the attempted limitation on the authority of Mr. Jensen. After a hearing the court granted the motion for continuance, although it appeared that the case probably could not be tried as scheduled. Trial was rescheduled for the first available date after March 16, 1964.

On April 10, 1964 the case was set for trial on September 21, 1964.

On June 24, 1964 Mr. Jensen, on behalf of appellants, filed a motion to modify the pre-trial order by reopening discovery, supported by a memorandum. Both appellees opposed the motion. On July 20, 1964 the court granted the motion to reopen discovery, stating as its reason the fact that the case was not scheduled to go to trial for more than 60 days.

On September 11, 1964 Mr. Boyko, on behalf of appellants again moved for a continuance stating that since August 3rd to date he had been in continuous trial; that he had continuous prior trial commitments scheduled through October 16, 1964 and that it would be impossible for him to attend the trial of this case on September 21, 1964. His affidavit went on to allege that his inability was beyond his control because the Emard case, scheduled for trial in Anchorage for the period July 20 to July 31, 1964 was continued at the court's own motion and for the court's own convenience to August 3rd and that the trial continued uninterruptedly through August 27th; that on August 28th he returned to his Los Angeles office and immediately commenced a criminal jury trial in Santa Barbara which was then in progress and estimated to last until September 14th; that immediately thereafter he would be required to attend the consolidated jury trial of two criminal matters in Los Angeles which would run through September 30, 1964 after which he was scheduled to go to Fairbanks to commence a trial on October 2nd to last a week, after which he was scheduled to attend a criminal hearing in Anchorage which would be completed on October 17th; that from October 18th to November 23rd he would be available to try this case, otherwise he would not be available until he had completed a scheduled trial in Seattle approximately 60 days after November 23, 1964.

The Bank filed a written memorandum in opposition, emphasizing the continuances that had already been granted to appellants; that counsel had been aware of the present trial setting since April 10, 1964 and was obliged to arrange his other trial settings accordingly; that appellants had had Mr. Jensen associated in the case since March of 1964 and that he had had the opportunity to familiarize himself with the case; that the motion did not comply with Civil Rule 6(d) since there had been no notice served five days before the hearing and that the motion was an indirect attempt to extend the discovery period for, although discovery had been reopened on July 20,

1964 pursuant to attorney Jensen's motion, no discovery had been taken to date.

Mr. Jensen appeared at the hearing on the motion for continuance to announce that he was not appearing to argue the motion; that he was not further appearing on behalf of Mr. Boyko; that he wished to be excused from the hearing as he did not intend to represent appellants at the trial because he had been employed by Mr. Boyko only to represent them on procedural matters and that Mr. Boyko now had attorney Tucker present in court to represent him on the motion for continuance. Mr. Tucker then stated that he appeared only for the purpose of arguing the continuance and not as counsel for appellants.

The court remarked that on April 10th the case had been set to be tried on September 21st; that appellants had had more than five months notice; that Mr. Boyko's affidavit did not state that any of the cases he was then engaged to try had been set for trial prior to this case; that he wondered if it was not Mr. Boyko's responsibility to advise the California courts of his Alaska settings, finally stating that the showing was insufficient and that the motion would be denied.

On September 18, 1964 Mr. Boyko filed a supplemental affidavit in support of a motion to reconsider the request for a continuance, outlining in detail his trial schedule "as of the time immediately following the last trial setting in the above entitled cause" when this case was set for trial on September 21, 1964. The list commenced with trial of the Emard case in Anchorage on July 20, 1964 and listed trials in Anchorage on August 3rd, in Santa Barbara on August 11, an arbitration hearing and a criminal trial in Los Angeles on August 25th and September 8th respectively, trial of this case on September 21, 1964 and trial of a case in Fairbanks on October 5th. The affidavit realleges that the continuance of the Emard trial from July 20 until August 3 was the principal reason for counsel being unable to attend the trial and goes on to explain that thereafter trial settings in California were changed to accommodate this delay; that the criminal case he was presently trying had begun on September 1st and was expected to last only four days, but that as of the date of the affidavit (September 18, 1964) the prosecution had not concluded its case and that it was his estimate that the trial would not go to the jury before September 29th. The affidavit again alleged that the delays which brought on his dilemma were the fault of and caused by the Anchorage court for its own convenience and asked that his request for a 30 day continuance be granted. Again, the Bank filed opposition to the motion.

The motion was heard on September 21, 1964 and was argued for Mr. Boyko by attorney Tucker. Appellant Harry E. Gregoire took the stand at Mr. Tucker's request and informed the court that he had talked with Mr. Boyko on the telephone that morning; that Mr. Boyko had advised him that he had commenced his defense in the criminal trial on Friday (September 18th) and would be in court the rest of the week, but that there might be a continuance because the judge was ill and that he was sending a telegram to Judge Moody and a special delivery letter to Mr. Gregoire.

The court denied the motion on the ground that it was not timely and the showing inadequate and announced that the case would go to trial on Wednesday, September 23, 1964.

When the case was called for trial on September 23, 1964 attorneys Jensen and Tucker presented to the court a form entitled "Withdrawal of Counsel", stating that with the consent of their client attached thereto, they, Jensen and Tucker, were withdrawing. Attached was a letter of that date signed by Harry E. Gregoire addressed to attorneys Tucker and Jensen expressing appreciation for their services to Mr. Boyko, but stating that for the purpose of the trial he recognized only Mr. Boyko as the trial attorney and that "In the event that you were ordered to represent me in court I would not recognize you as the trial attorneys."

At the court's request Harry E. Gregoire took the stand and confirmed the statement contained in the letter. When asked by counsel for appellee Cronin if he was discharging Tucker and Jensen, appellant replied that he was unable to answer because of lack of counsel and that he was making this reply in accordance with written instructions from Mr. Boyko. The court then advised Mr. Gregoire that unless he desired that Mr. Tucker and Mr. Jensen not represent him, the court would require them to do so. The court further advised him of the difficulty of representing himself and then asked him if he still wanted the court to relieve them as counsel. Mr. Gregoire replied, "Yes, sir."[1] The court thereupon signed the order relieving Mr. Jensen and Mr. Tucker as counsel in the case. The court then proceeded with the trial which ultimately resulted in judgment against the appellants.

■ Generally a trial court's refusal to grant a continuance will not be disturbed on appeal unless an abuse of discretion is demonstrated.[2]

In 1961 this court stated that except in unusual circumstances it would not substitute its judgment for that of the trial judge in matters involving the diligence of counsel or the parties in processing their cases.[3]

The primary facts upon which appellants rely to show an abuse of discretion are:

(a) That the trial court changed the date of trial of the Emard case from July 20, 1964 to August 3, 1964 for its own convenience, and that this resulted in a later conflict on September 21, 1964 which made it impossible for Mr. Boyko to attend the trial of this case.

(b) That Mr. Boyko's request for a continuance was a reasonable one.

(c) That the trial schedule conflict was no fault of Mr. Boyko's and that his trial commitment in Santa Barbara actually made it impossible for him to attend the trial of the instant case in Anchorage.

The above claims will be considered in the order of listing.

It is repeatedly alleged in the affidavits of Mr. Boyko and in appellants' briefs that the primary cause of Mr. Boyko's trial conflict was the delay in bringing the Emard case to trial. These allegations are not supported by the record. The court file in the Emard case reveals that it was not until June 3, 1964 that that case was first set for hearing on July 20, 1964. As of that time the instant case had been set for trial almost two months. The Emard trial was never officially scheduled to be completed on July 31, 1964 as is alleged. A study of the transcript of proceedings had in the Emard case reveals that the resetting of the case from July 20 to August 3, 1964 was as much to accommodate some of counsel who were pressing for continuance and to dispose of the numerous motions, as it was due to a temporary shortage of judges in the superior court.

It is true that trial of the Emard case consumed about 25 days. The trial estimate may very well have been 11 days as counsel alleges. The fact that the trial took longer than counsel expected was not the fault of the superior court, as is implied.

■ Our conclusion is that there is no substance to the allegation that the trial court was responsible for the conflict in appellants' counsel's California trial schedule which occurred in September of 1964.

---

1. The court's complete statement is reported on page 40 of this opinion.

2. Grunewald v. Missouri Pacific Railroad Company, 331 F.2d 983, 985–986 (8th Cir. 1964).

3. Adams v. Cowan, 360 P.2d 1013, 1014 (Alaska 1961). On the subject of the trial court's discretion in granting or refusing a continuance see: Link v. Wabash R. R. Co., 370 U.S. 626, 633–635, 82 S.Ct. 1386, 1390–1391, 8 L.Ed.2d 734, 739–740 (1962), Miller v. Johnson, 370 P.2d 171, 173–174 (Alaska 1962), Harms v. Simkin, 322 S.W.2d 930, 933–934 (Mo. Ct.App.1959) Rev'd on other grounds, Brown v. Stroeter, 263 S.W.2d 458, 462 (Mo.Ct.App.1953).

Appellants' assertion that their request for a continuance was a reasonable one must be next examined.

The record reflects that appellants obtained a continuance of trial, over appellees' objections, on November 26, 1963. Appellants then obtained a stay of proceedings in the case on December 3, 1963 in order to petition for review of the trial court's order denying another continuance. The stay had the effect of vacating a December 4th trial setting and of holding all proceedings in abeyance until January 10, 1964 when the supreme court denied review. The Bank immediately moved for an early trial and a setting of March 16, 1964 was eventually obtained over Mr. Boyko's objection that that date would probably interfere with his trial schedule in California. On March 10, 1964 the trial court granted Mr. Boyko's request for a continuance of the March 16th trial date. On April 10, 1964 the case was set for trial on September 21, 1964.

Appellants' last request for a continuance was dated September 5, but filed on September 11, 1964. As of those dates the instant case had been set for trial for a period of five months. The motion alleged that a 30 day continuance was needed because appellants' trial attorney had been engaged in continuous and consecutive trials since August 3rd and would continue to be so engaged until October 16th. Appellants further alleged that they were unable to obtain other trial counsel and that in any event it would be impossible for anyone to become familiar with the case prior to the trial date. Mr. Boyko's affidavit in support of the motion stated that it would be "impossible" to attend the trial of this case on September 21, 1964. The reason given was that the superior court in Anchorage had rescheduled the Emard trial for its own convenience. The affidavit then outlined a busy trial schedule in California through September 30th to be followed by a trial in Fairbanks on October 5th. The trial of the instant case was entirely omitted from this schedule. The affidavit did not demonstrate that any of the

California trials or the Fairbanks trial were set prior to April 10, 1964 or that for any particular reason they were entitled to a trial priority. As of the date of this affidavit Mr. Boyko expected to complete trial of the Doakes case in Santa Barbara on September 14, 1964. Appellees filed a lengthy memorandum in opposition to the request for a continuance.

After hearing, the court found that the showing in support of the request for a continuance was insufficient and ordered that the trial "go on as now set, for the week of September 21, 1964".

We agree that the showing in support of appellants' request of September 5th was insufficient. Trial of the instant case had twice before been continued at appellants' request over appellees' strenuous objections. There was no allegation that any of the trial settings which were being given preference by counsel for appellants were entitled to such preference. The fair assumption from the affidavit was that all of the trial settings mentioned in the affidavit were junior to the setting of the instant case and, as we have mentioned, appellants' allegation concerning the Emard case was without substance. In his later affidavit of September 18th Mr. Boyko admits that as of the date of his affidavit of September 5th it seemed likely that he could fulfill his California trials in early September and "proceed with the Gregoire trial on September 21", but that the motion was filed out of an "abundance of caution, and knowing the uncertainties of trial estimates." It is not easy to reconcile this later admission with his sworn statement of September 5th that it would be "impossible" to attend the trial of the instant case.

This brings us to his motion to reconsider and the supporting supplemental affidavit of September 18, 1964. As of the date of this affidavit the Doakes trial had continued three days beyond the September 14th estimate and the state presumably had not yet completed its case. Mr. Boyko's estimate of the date of completion of the Doakes case was September 29th, the conclusion of

which, according to his affidavit, would allow him only a few days to travel to Fairbanks for his scheduled trial there. Again, trial of the instant case is omitted from any of Mr. Boyko's trial plans and his request was "that the 30 day continuance be granted without further delay."

Hearing on this motion was held on September 21, 1964. At the hearing it was revealed to the court by appellant Harry E. Gregoire that he had talked with Mr. Boyko by telephone that morning; that the prosecution had completed its case in the Doakes trial and that Mr. Boyko had been presenting his evidence since September 18th, which was considerably sooner than he had previously forecast. Attorney Tucker, appearing for Mr. Boyko, argued for the full 30 day continuance. A check of the court's and counsel for appellees' trial schedule at the September 16th hearing on appellants' request had revealed that a 30 day continuance would result in delaying trial until early the following year because of existing trial commitments of the court and counsel for appellees then in effect.

■ In view of the foregoing we are of the opinion that the request for and continued insistence on a full 30 day continuance was not reasonable. Appellants or their counsel should, prior to September 23rd, have requested a short continuance or a continuance from day to day to await completion of the Doakes trial. As of September 21st it was quite obvious that the Doakes case would be completed considerably sooner than had been estimated. It was also then known that the instant case could not go to trial until at least September 23rd. Mr. Boyko was in daily telephone contact with his Anchorage secretary and had available Mr. Jensen and Mr. Tucker who could have caused such a request to be filed in Anchorage by September 22nd, the day before trial began. Nevertheless, Mr. Boyko's telegram of September 21st to the judge urged the granting of a 30 day continuance without revealing to the court the changed circumstances of the Doakes trial.

Appellant Harry E. Gregoire was in court on September 21st, was aware of all of the above facts, and could have requested the day to day indulgence of the court. As it turned out, and as will be more fully discussed later in this opinion, the Doakes trial was practically, if not fully, completed on the same day the instant case proceeded to trial.

The last fact to be examined is the contention that the trial schedule conflict was no fault of appellants or their counsel and that Mr. Boyko's trial commitment in Santa Barbara actually made it impossible for him to attend trial of the instant case in Anchorage.

After studying the record we have no doubt but that by a careful management of his trial commitments Mr. Boyko could have avoided most of the trial conflicts which he emphasized in his affidavits in support of his motion for a continuance. In view of the previous continuances granted at appellants' request, and the 5½ months notice accorded by the last trial setting, the instant case was entitled to and should have been given priority by counsel in arranging his fall trial schedule. Instead, subsequent to the trial setting of the instant case, counsel permitted himself to become committed to the trial of three criminal matters in California during the month of September. When a possibility of conflict developed, counsel insisted on a full 30 day continuance of the instant case in order to preserve intact the entire California trial schedule.

What counsel might not have been able to avoid was the possibility of a conflict caused by the fact that a particular case would require an unreasonably long period to try. This apparently is what happened with respect to the Doakes case. However, instead of asking the Alaska court for day to day continuances or for a definite short term continuance, counsel stubbornly insisted on a full 30 day continuance in order that he might attempt to honor all of his trial commitments except that of the instant case, the trial setting of which was in fact senior to all of his other commitments.

The foregoing would apply where it appeared that a definite trial overlap was going to occur which would make it impossible for counsel to attend the Alaska trial without leaving the California trial before it had been completed.

It appears from the record, however, that no such overlap occurred, or, that if there was an overlap, it was no more than a day or a portion thereof.

During the hearing of November 4, 1964 on appellants' objections to proposed findings and judgment, in discussing with the court the court's refusal to grant a continuance, the following transpired:

MR. BOYKO: * * * I was ready for trial on the 23rd; I would have been actually, physically able to try it three, four days later. I would have hated to do it but I would have done it. All the Court would have had to do is inquire of Mr. Gregoire, 'Well, now, what is the situation with Mr. Boyko? Get on the phone and find out.' If he had called me on the 23rd, the day this happened, I would have been able to tell him this much; that I was just in the midst of the argument to the jury, and chances were that in a day or—in twenty-four hours that could be over. I couldn't have guaranteed then.

THE COURT: Well, now, you had counsel up here that had appeared specially for other purposes; why couldn't they have appeared specially for this purpose?

MR. BOYKO: What purpose, Your Honor?

THE COURT: For telling the Court what your status was on—

MR. BOYKO: I did, it's right in the record. They told the Court that I was in a trial, and this is the fact.

THE COURT: Well, but you—they didn't tell the Court that you might be available on the 24th.

MR. BOYKO: They didn't know it, and neither did I know it.

Later during the hearing the record reflects that counsel denied that he had just stated to the court that if someone had called him on the telephone on the 23rd that he would have been able to tell them that he could have been there in a day or so. However, still later in the same hearing the following transpired:

MR. BOYKO: I know. But they called me on the phone and told me that the motion for continuance had been denied for the second time, and there was nothing I could do.

THE COURT: But it was denied for thirty days. It wasn't denied for two or three days.

MR. BOYKO: Well, it was set for trial on the 23rd, and that was going to be it, and there wasn't—I didn't have any way of knowing that if I said to Your Honor, 'Well, I'll kill myself and come up here as soon as I get out of this.' I came home from that jury, I think it was, at 3:00 o'clock in the morning of the 24th.

THE COURT: Well, by the same token * * *

MR. BOYKO: I presume it would have been possible for me to hop a plane and come up here on the 23rd.

 We find that there is no substance to appellants' claim that a trial conflict developed through no fault of theirs or their counsel and that the trial commitment in Santa Barbara made it impossible to attend the trial of the instant case in Anchorage.

Appellants' next point on appeal is that the appellees, with the acquiescence and support of the trial court, engaged in a cumulative course of conduct which resulted in a procedure so basically unfair and unjust as to require a new trial.

Appellants list six occurrences during the life of the case as being illustrative of their contention, but state that they rely principally upon the court's abuse of discretion in disqualifying Peter B. Walton, Esq. as appellants' counsel on the eve of trial when

he was the only counsel fully familiar with the case and prepared to try it.

Mr. Walton's first appearance in the case was on November 21, 1963 when he moved for a continuance on behalf of appellants. At the hearing on this motion it was made clear that he represented the appellants only for the purpose of making the motion. On December 3rd Mr. Walton obtained a stay of proceedings and attempted to have the trial court's order denying a continuance reviewed by the supreme court of Alaska, but review was denied by this court on January 10, 1964.

On January 24, 1964 the Bank moved to disqualify Mr. Walton on the ground that he had previously represented the Bank in procuring from appellants the mortgage and note which formed the basis for the Bank's first claim for relief and was, in this case, trying to represent the appellants, who denied the enforceability of the same note and mortgage. It was alleged that Mr. Walton might have knowledge of facts underlying the transaction which "may or may not be of great value to the defendants [appellants] in defending this litigation." [4]

At the time the motion was filed Mr. Walton was not representing appellants generally, however, on January 28, 1964, four days after the filing of the motion, he filed a joint general appearance in the case with Mr. Boyko.

Mr. Walton filed an extensive affidavit denying a conflict of interest. Affidavits to the contrary were filed by counsel for the Bank and Karl V. Holmberg, a senior vice-president of the Bank. The court held a hearing on January 30, 1964 at which time the testimony of Mr. Walton, appellant Harry E. Gregoire, and Mr. Karl V. Holmberg and Mr. John Holmberg, both officers of the Bank was taken.

The affidavit of Karl V. Holmberg was that on behalf of the Bank he employed the law firm by which Mr. Walton was employed to represent the Bank in obtaining a mortgage to secure a pre-existing indebtedness from appellants; that the firm

---

4. The motion was based on a conflict between Mr. Walton's position and the requirements of Canon 6 and Canon 37 of the Canons of Professional Ethics.

Canon 6 states:

6. *Adverse Influences and Conflicting Interests.* It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

Canon 37 states:

37. *Confidences of a Client.* It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.

If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime, is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened.

did prepare such a mortgage and billed the Bank for their services and were paid, a photostatic copy of the statement for services rendered being attached to the affidavit.

The testimony of Mr. Karl V. Holmberg was to the same effect as his affidavit. In response to questioning by appellants' counsel, he stated that to his knowledge the law firm did not acquire any confidential information through its representation of the Bank in obtaining the mortgage and note from appellants.

Mr. John Holmberg testified that he was employed as chairman of the executive committee of the Bank; that the Bank was participating with the Bank of Homer in a loan to appellants which was delinquent and unsecured; that he discussed the problem with Mr. Walton many times; that the law firm was representing the Bank and the Bank of Homer in obtaining security for the loan; that when the mortgage had been completed Mr. Walton delivered it to him and that no information was imparted to Mr. Walton that was not also available to appellants.

Mr. Walton's affidavit stated that the mortgage to secure the pre-existing indebtedness was prepared by him for Mr. Gregoire at Mr. Gregoire's request; that he had never at any time conferred with anyone with the Bank concerning the mortgage; that the Bank was not billed for the service; that he mailed the completed mortgage to Mr. Gregoire and that the Bank had nothing whatever to do with the preparation of the mortgage. On cross-examination Mr. Walton admitted that Mr. Karl V. Holmberg had telephoned him to ask if the instrument had been prepared and that he advised him that it had; that he may have delivered the mortgage to Mr. John Holmberg, he didn't remember. Mr. Walton again denied that the firm by which he was employed was paid for preparing the mortgage.

At the conclusion of the hearing the court was faced with the task of resolving a direct conflict in the testimony of the witnesses on certain key aspects of the claim of conflict of interest. The appellant Harry E. Gregoire had filed an affidavit in which he admitted execution of the mortgage in question but denied the validity of "the debt underlying it."

On January 31, 1964 the court stated in open court that the motion to disqualify was granted. When the court's decision was announced Mr. Walton stated to the court:

Anticipating that that might be the ruling of the Court, I would like to submit to the Court an order.

Counsel then disagreed as to the form of the proposed order, so the matter was set down for hearing.

On February 4, 1964 when the matter was called for hearing, and during the time the court and counsel were discussing the question of whether a conflict of interest existed, the following transpired:

MR. WALTON: If it please the Court, perhaps I can help the Court here. I realize it's always unpleasant for the Court to have to disqualify a lawyer, and it's always unpleasant for a lawyer to be disqualified. I'm the kind of a person, I hate to walk away from a task. I'd rather be told to get out before I'd walk away voluntarily. The Court has made its feeling clear. I expect—I respect the Court's feelings. If I can make the whole issue a bit simplier [sic] by withdrawing at this time from the case, and it's apparent to me, I mean to do so right now.

THE COURT: Well, I want it known that the Court was reluctant to enter the rule because we felt that you were certainly sincere, and I believe that on the basis of what occurred here, that the Court heard nothing which would indicate that you had any confidential information, but I did as I indicated merely because someone had raised the question and you can never tell the public there isn't some conflict.

MR. CLARK: Yes.

MR. WALTON: Will the Court accept my written withdrawal from this case? Incidentally, Your Honor, I might also point out that I had thought that there was possibly an opportunity for me to represent Gregoire on his third party complaint against Cronin; but I think Your Honor probably would not want me to have influence at all.

THE COURT: Well, it's not how I personally feel about it, and the Court doesn't run on that basis.

MR. WALTON: No, but your feelings of propriety—

THE COURT: Right—

MR. WALTON: Therefore, I'll just withdraw from the case.

THE COURT: Well, of course, with that in mind, the Court wouldn't have to rule on it.

MR. WALTON: That's why I quote it. I can make the whole issue moot.

It is obvious from the foregoing that Mr. Walton voluntarily withdrew as counsel for appellants. However, it appears quite likely that if he had not done so, the court would eventually have entered an order disqualifying him.

We are not required in this appeal to determine whether Mr. Walton was actually disqualified under the facts. All we are asked to determine is whether the trial court acted in such an unreasonable and unjustifiable manner as to amount to an abuse of discretion.

We do not think so. One of the main questions before the trial court was whether Mr. Walton had acquired any knowledge or information while representing the Bank in procuring the mortgage which might be utilized on behalf of appellants in resisting a judgment based on the mortgage. Appellants were admitting execution of the mortgage, but denying liability on the debt purported to be stated in the mortgage because of the alleged conspiracy and conversion of officers of the Bank and the Bank of Homer. Since it was not then known what testimony would be produced by appellants at a trial to substantiate their allegations, it could not be determined whether a conflict of interest might not develop during the trial which would require Mr. Walton to withdraw, if he was not in fact already disqualified. In addition, there was the question of propriety and the public image of the legal profession, as the judge pointed out.

The facts are similar in many respects to those in Wilson v. Wahl [5] where the attorney prepared claims against the city and thereafter accepted employment by the city to defend against the claims. Canons 6 and 37 had been considered by the court when it stated:

No dishonesty or intentional wrongdoing is imputed to Mr. Wahl, and neither has it been made to appear that any information obtained by him in connection with the preparation of the statutory claims has been used by him in violation of his obligations as an attorney to the disadvantage of any of these plaintiffs. Nevertheless, there is no doubt in our minds, and we have no hesitancy in holding, that under the circumstances he should not have accepted the employment in behalf of the city in defense of the damage actions, and that his doing so constituted a violation of the spirit, if not the letter, of the mentioned Canons of Professional Ethics (Canons 6 and 37) and the elementary general rules laid down in the authorities cited. When confronted with such a situation, and doubt exists in the mind of an attorney as to the proper course to follow, the doubt always should be resolved in favor of not accepting the employment. An attorney should avoid not only situations where a conflict of interest is actually indicated, but also those in which a conflict is likely to develop.[6]

5. 182 Kan. 532, 322 P.2d 804, 810 (1958).
6. Wilson v. Wahl, supra note 5 appears to express the view of the overwhelming weight of authority. See Annot., 52 A.L.R.2d 1243, 1247 (1957); Annot., 51 A.L.R. 1307 (1927).

Instead of amounting to an abuse of discretion, we consider the trial judge's comments with respect to Mr. Walton's situation as being entirely appropriate. Mr. Walton's withdrawal was likewise appropriate.

Several statements made in appellants' brief in support of the above point, although not argued or referenced to any particular portion of the record for substantiation, require comment:

■ (1) The court encouraged appellees in their effort to force this case to trial after they had pressured attorney John Stern out of the case by means of economic leverage.

The record reveals that the Bank objected strenuously to the motion of Mr. Stern to withdraw because of the fact that the withdrawal would leave appellants without counsel on the eve of trial. Appellants consented to the withdrawal and had picked up the case files. There is nothing in the record to support the statement that the court encouraged appellees to force the case to trial.

■ (2) The court compelled their new attorney, Peter Walton, Esq., to waste valuable time and effort to gain a reasonable continuance, while he was trying to master the facts and law of this complex case.

The record reflects that the opposite is the truth. When Mr. Walton appeared to request a continuance he made it abundantly clear to the court that he was appearing for the sole purpose of pleading for a continuance. Mr. Walton did not enter a general appearance in the case until January 28, 1964, some two weeks after his moves for a continuance had been denied.

■ (3) The Court arbitrarily and without good reason, disqualified attorney Walton as soon as it had become apparent that he was now fully prepared and able to proceed to trial.

Mr. Walton did not enter his general appearance in the case until January 28, 1964, four days after the motion to disqualify had been filed. The minute order granting the motion to disqualify was entered three days later on January 31, 1964 and before he had had time to become "fully prepared". Further, during the hearing of February 4, 1964, Mr. Walton twice stated to the court that he had no intention of trying or assisting in the trial of the case.

■ (4) The trial judge contributed to the ultimate confusion by upsetting the entire trial calendar, for his own personal convenience, and then using the alleged sanctity of that very calendar as the excuse for refusing a continuance, when appellants' counsel became unavoidably engaged in trial, in another court.

Each of the above allegations is refuted by the record as cited and discussed in the foregoing opinion.

The last point on appeal to be considered is the claim that the judgment is void because the procedures employed in the case violated the constitutions of the United States and of Alaska by infringing upon appellants' right to trial by jury and by denial of procedural due process and of the equal protection of the laws.

When the case was called for trial on September 23, 1964 the first matter considered was the request of Mr. Jensen and Mr. Tucker to be permitted to withdraw as counsel in the case supported by the written consent to their withdrawal signed by appellant Harry E. Gregoire which has been described previously in this opinion.[7] The court then advised Mr. Gregoire, who was present in court, as follows:

THE COURT: Mr. Gregoire, I at this time advise you that Mr. Tucker and Mr. Jensen have appeared in this case on your behalf, either at your request or at your attorney's, Mr. Boyko's request. If you do not, of your own will, at this time desire that they not represent you, the Court will require them to remain here to represent you to the extent that they may do so. If you desire them not to represent

7. Page 32, supra.

you, the Court will relieve them. But I want to advise you the situation you're in. The Court is going to proceed with the trial of this case; you will either have to proceed on your own, with these counsel or some other counsel that you can get. The Court has ruled that you've got to go to trial. Now, in view of that, do you want the Court to go ahead and relieve them as counsel? I'll state to you now, it's quite difficult for a person who is not trained in the law to represent himself in a case, and particularly in a case of this of this [sic] nature. Now, in view of that, do you still want the court to relieve them as counsel?

MR. GREGOIRE: Yes, sir.

The court thereupon signed the order relieving them as counsel for appellants.

Upon being asked if he was ready to proceed to trial Mr. Gregoire read a statement which he stated had been prepared for him by Mr. Boyko which stated that he was not represented by counsel for reasons beyond his control; that he was unable to represent himself; that if forced to proceed with the trial he would attend under protest and that he had been advised by Mr. Boyko that he was being deprived of numerous constitutional rights.

The jury was called in and appellant Gregoire was asked by the court if he was ready to proceed to which he replied "Under protest, Your Honor." When again asked if he was ready to proceed, he replied, "Yes, sir." Immediately thereafter the following proceedings were had:

Mr. RENFREW: Mr. Gregoire, you state that you're ready to proceed and that you are proceeding under protest. I'll ask you: Do you have any intention of putting on proof in support of your allegations in your claim?

MR. GREGOIRE: No, I'm on the statement I read, Mr. Renfrew.

MR. RENFREW: Your Honor, my position is this: That if no proof is to be offered by Mr. Gregoire, then, apparently, the only matters before the Court would be the matter of the mortgage fore-

closure at this time—at this proceeding. And, under those circumstances, it would be a useless and futile thing to empanel a jury.

The court then asked Mr. Gregoire if he intended to participate in the selection of a jury whereupon he replied, "No, sir."

After the roll of the jury had been called, the following transpired:

THE COURT: Yes. Mr. Gregoire, you may come forward if you desire to participate in this since you're representing yourself. The record will reflect—do you want to come forward, Mr. Gregoire?

MR. GREGOIRE: No, I'm just attending under protest, Your Honor.

THE COURT: All right, the record will reflect he does not desire to be present. Mr. Gregoire, do you want a jury empanelled, and are you going to participate in the panelling of this case?

MR. GREGOIRE: Can't answer that, Your Honor, because I have been deprived of services of counsel.

THE COURT: All right, ladies and gentlemen of the jury, the defendant Harry Gregoire has refused or does not desire to have a jury empanelled; therefore, you're excused to report subject to call of the Clerk of the Court. Thank you for your services. Plaintiff, you may make your opening statement.

█ It appears clear enough that there was not an infringement or denial of appellants' right to a trial by jury. Appellants simply refused to participate in the selection of a jury for the trial of those issues raised in their pleadings which may have been properly triable by a jury.

The reason given by appellant Harry E. Gregoire for refusing to participate was that he was not represented by counsel for reasons beyond his control and that he could not represent himself.

We do not agree that appellants were deprived of counsel by reason of circumstances beyond their control. We are of the opinion that it was quite possible for

them to have obtained legal counsel in time for trial on September 23, 1964 if they had desired.

We have already expressed the view that their counsel, Mr. Boyko, could and should have requested a day to day continuance of this case after it became obvious to him that he would complete the Santa Barbara trial at or about the time this case was scheduled to go to trial, instead of ignoring his obligation to try this case and insisting on a full 30 day continuance to fulfill his other trial obligations.

But entirely apart from the fact that Mr. Boyko, by his own admission, could have been present in Anchorage by September 23rd or 24th, we feel that appellants were remiss in not taking steps to assure themselves of legal representation when they learned, on or about September 11th, of the possibility that Mr. Boyko might not be available on September 21st. As of that time Mr. Jensen had been an attorney of record since March 2, 1964. It is true that he had attempted to limit the scope of his appearance and responsibility to procedural matters. On the other hand, it appears that, with the exception of certain tapes, he had been in possession of all the files in the case since his appearance to obtain the March 6, 1964 continuance. He had also prepared and successfully argued a motion to reopen discovery in July of 1964.[8] Instead of making an effort to utilize Mr. Jensen's services as a trial counsel, appellant Harry E. Gregoire appeared in court to advise the judge that if either Mr. Jensen or Mr. Tucker were ordered to represent him by reason of the fact that they were attorneys of record, he would not recognize them as his counsel.

We find that appellants and their counsel were both at fault. Both had an obligation to act timely to honor their trial obligation. Had they done so appellants need not have gone to trial without counsel, therefore no constitutional right was infringed or violated and no constitutional question is raised.

Before disposing of this appeal we are required by its content to officially notice and comment on appellants' brief. Shortly after this brief was filed both appellees moved to strike on the ground that it contained impertinent, intemperate insulting language which was disparaging of the dignity and integrity of the court and counsel. We denied the motion without making a determination of its merits in order not to delay a decision on the merits of the appeal.

In our study of the brief and the record we have found that in addition to the statements already quoted in this opinion,[9] the brief is replete with abusive, disparaging and intemperate statements directed at both trial judges concerned in the case as well as counsel for appellees. None of the statements were substantiated by the record.

A sampling of the type statement referred to above follows:

A careful and unbiased reading of the record should lead this court to the inescapable conclusions that from the early beginning, appellees engaged in a deliberate course of action which consisted of bringing pressure to bear against appellants' attorneys of record, with the objective of forcing them out of the case, while, simultaneously, clamoring for an early trial. In this underhanded conduct, they were actively aided and abetted by the court in various proceedings, only the more significant of which are reiterated here:

When coupled with the cumulative effects of the other procedural mistakes made by the trial court and the subtle (and at times not so subtle) injustices flowing from each of them, it seems inescapable that the total result is a

8. We shall not attempt to pass upon the question of whether attorneys Jensen and Tucker could validly limit the scope of their responsibility in the case since it has not been briefed by counsel as a point on appeal.

9. Page 40, supra.

proceeding of such fundamental unfairness and injustice as to create a legal and moral compulsion upon the appellate court to reverse the resulting judgment and to remand the case for a new trial.

The trial court erred in acquiescing in, condoning, and even encouraging the unethical conduct of appellees and their counsel, in repeatedly depriving appellants of their chosen attorneys of record, by using diverse means of forcing them out of the case, while concurrently keeping up extreme pressure to force the case to trial, with the obvious intent of avoiding a show-down on the merits.

In Enders v. Sinclair Ref. Co.[10] in commenting on the brief supporting a motion for rehearing, the court said:

Plaintiffs' brief on motion for rehearing contains many impertinent, disrespectful, abusive statements reflecting upon the court. These statements are of such a premeditated, insulting character that they cannot be permitted to pass without notice. Counsel for plaintiffs is an experienced lawyer, and his conduct cannot be excused on the ground of petulance or a failure to appreciate the implications of the language contained in his brief. The language is contemptuous, and counsel is subject to reprimand for his unlawyerlike conduct.

The motion was then denied, with $50 costs and plaintiff's brief was stricken from the court files. The remarks of the Wisconsin court are particularly applicable to the facts of this case.

In In re Glauberman[11] the court gave two examples of objectionable statements contained in the briefs which read:

'Here, the Court, without objection by the complainant's counsel, no longer plays the part of judex, that he (the vice chancellor) talks about on page 178 of S. of C., but acts as complainant's counsel, which he does throughout the entire proceeding.'

and

'The court (below) committed a colossal error in refusing to permit the Equitable project, if the condition of this company was such that but sixty days thereafter, he (the vice chancellor) thought that this company should be strangled and destroyed. The case in a "nutshell" resolves itself to the following: If not on the date of dismissal of Bernstein Suit No. 1, why now on July 25, 1929?'

Orders to show cause why they should not be held in contempt were issued to counsel. The matters were treated as criminal contempts committed in the presence of the court. Responsible counsel was fined $250 and suspended from appearing in any case in that court for a period of one year and the offending brief stricken from the record. The court stated:

The doctrine that a counsellor-at-law is in contempt who has filed an impertinent, scandalous and contemptuous brief, has been so thoroughly established in this state, that it is entirely unnecessary to cite the many cases in other jurisdictions which sustain that principle.

 In the six and one-half years of existence of this court this is the first instance in which a counsel has employed abusive and intemperate language in his brief and has accused the trial court and opposing counsel of unethical and underhanded conduct. We consider the facts to be aggravated when compared with those contained in reported decisions on the subject.[12] But since it is the first in-

10. 220 Wis. 254, 265 N.W. 67 (1936).

11. 107 N.J.Eq. 384, 152 A. 650, 651-653 (Ct.Err. & App.N.J.1930).

12. A. Makray, Inc. v. McCullough, 103 N.J.L. 346, 135 A. 815, 817 (Ct.Err. & App.1927); Getter v. Levine, 315 Mich. 353, 24 N.W.2d 149 (1946); Leszczynski v. Penn. Ry., 274 App.Div. 1003, 84 N.Y.S.2d 579, 580 (1948); City of San Antonio v. Santa Rosa Infirmary, 249 S.W. 498, 510 (Tex.Ct.Civ.App.1923), rev'd on other grounds, 259 S.W. 926 (Tex.Comm'n App.1924); Carpenter v.

stance of its kind we shall dispose of it by reprimanding Mr. Boyko and admonishing him to be governed in the future by the rules of court and professional courtesy in his representations to the court and in his references to opposing counsel.

Since this court entertained some doubt as to whether appellants' unfulfilled obligation to make a timely attempt to procure substitute counsel was such that the dismissal of their counterclaim and third

party complaint with prejudice should stand, it decided to resolve this doubt in favor of allowing appellants their day in court. Therefore, it is the order of this court that the "with prejudice" aspect of the judgment below dismissing appellants' counterclaim and third party complaint be set aside, upon such terms and conditions as the trial judge deems appropriate under Civil Rule 40(f) (2).[13] The judgment in all other respects is affirmed.

Pacific Mut. Life Ins. Co., 10 Cal.2d 307, 74 P.2d 761, 766–767, aff'd Neblett v. Carpenter, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938).

13. Civ.R. 40(f) (2) states:
 (2) Unless otherwise permitted by the court, application for the continuance of the trial of the case shall be made to the court at least 5 days before the date set for trial. The application must be supported by the affidavit of the applicant setting forth all reasons for the continuance. If such case is not tried upon the day set, the court in its discretion may impose such terms as it sees fit, and in addition may require the payment of jury fees and other costs by the party at whose request the continuance has been made.